Good morning, your honors. May it please the court, Jody Carlson on behalf of Appellant Fernando Arango. Your honors, Mr. Arango seeks the reversal of the district court's ruling refusing to recognize the doctrine of latches in invalidating the government's complaint for denaturalization. This isn't a case of the government strictly enforcing the immigration statutes. This is a case of the government manipulating the immigration statutes. In this case, Mr. Arango first arrived to the United States in 1972 on a student visa. Mr. Arango obtained his permanent residence status in 1980. And in 1982, it was discovered that Mr. Arango obtained his permanent residence status through a sham marriage. In fact, it's on September 15, 1982, Mr. Arango signed an affidavit to that effect demonstrating that he did in fact obtain his permanent residence status illegally or improperly. However, Mr. Arango's position is that although the government was aware of the sham marriage, the government was complicit in allowing him and his sister, Ms. Amparo O'Guina, to naturalize despite the illegal obtainment of the permanent residence status. And that is what has the clock start to run in your view? Yes, notice, what is the denaturalization the clock start to run as opposed to some of the earlier events? In this case, September 15, 1982, when Mr. Arango signed the affidavit, that was when the government had a permanent notice of Mr. Arango's illegal obtainment of his permanent residence status. And therefore, the government waited until 2009, which is 27 years later, to initiate denaturalization proceedings. When was he naturalized? He was naturalized in 1989. Okay, but the 1982 date can't work, right? Well, that was when the government was aware of his illegal obtainment. So that means that you think that the government shouldn't have granted him citizenship in the first place in 1989. So if anything, the government stayed in the election for 20 years, or you can say 27 years. This argument seems to me to sound as much inflexious as it does conceivable. That may be correct, Justice Braby. It might be an estoppel issue. An estoppel against the government is almost never very attempted in the court. The Supreme Court has reserved the possibility that it might be available in the most courageous of cases. I believe this court has ruled in Salgado Diaz v. Gonzalez that a votable estoppel can be applied to prevent the government from relying on consequences of its own affirmative conduct. So I believe... What's the government's affirmative misconduct? The affirmative misconduct is the government knowing and voluntarily aware and complicit with Mr. Arango's illegal... And this is just the government, just generally, not talking about any particular person. I mean, it looks like the mistake that was made here was that there were two files created on Mr. Arango and the government filled very often after he was convicted of a cocaine deal. But the government had explicit knowledge. It's been said that the government is really making a constructive knowledge argument. And then the question is, well, what's the support for that? Because we have this situation of there's this incriminating affidavit in the New York final, correct? Correct. So you're saying that that government, me over here, instead of having constructive knowledge, government me over here, that there was this affidavit in another final. And I'm not aware of case law that would make that kind of a leap. So I'm open to hearing, so I can look it up. And just to make you aware, I apologize, but I did not find any case law that's applicable in this context. But I can tell you that it stretches credulity to believe that Mr. Arango would apply to obtain his naturalization in 1989, knowing that he would, in fact, jeopardize his status to remain in the United States if he did big work for his beliefs that he was allowed to go ahead and naturalize. I don't think that argument goes too far, because certainly many individuals do things that jeopardize their immigration status when they probably shouldn't, whether it's signing up for a certain program that may or may not continue, or whether it's applying for asylum when, in fact, they have some kind of disqualifying felony. So the fact that somebody decides to see if they can go one step further, I'm not sure, is a legal basis for granting the naturalization. In addition to that, in 2002, Mr. Arango applied for a position with the Department of Homeland Security, which he knew he would have to comply with strict immigration sanctions. Well, as a positive, I thought that there was some misconduct on the part of my family to marry over these two files. One office didn't know what the other office had decided, and it was hard for Mr. Arango. He was given citizenship in the United States, which he probably was not entitled to. He was given a job with Border Patrol, which he never should have been given. And then he misbehaved and has made violations. Where's the bad things that happened to Mr. Arango as a result of government misconduct? The prejudice that Mr. Arango suffered was an effective evidence-sharing prejudice, meaning that during the trial, there were three INS agents who testified based on the recollection of events that had transpired in the early 1980s. And while some did remember the actual events. You missed my question. It can't be an evidentiary problem. The last argument is, well, those are old memories. That's not Mr. Arango's problem. In your argument, there's a permanent misconduct by the government. I want to know, how was Mr. Arango harmed here? He was never entitled to citizenship in 1989. That was the government's mistake. So he was never entitled to it. Now the government wants to take it away. And you want to argue that he, because of government misconduct, well, where's the harm to Mr. Arango? He got something he wasn't entitled to twice. How is his citizenship due to a job with Border Patrol? The harm is that he's built a life here since the 1970s, and to think he was going to be comfortable here for the rest of his life, that's the harm. It's only now he gets to sit here for the rest of his life because the government's used his misconduct. By unlawfully approving his citizenship. Or not just so wrongfully approving, but being complicit in a crime. He could still be in a situation he was before had he not committed the crime, right? That's correct. He was in this projected bubble of ignorance, and he's the one that broke the bubble. That's correct. But there are other immigration statutes that should be in play in that because he was a United States citizen, the government is trying to make him come around and to try to get him removed from the United States by using that instance of criminal conduct in which the government would not be able to do so had it not been for Mr. Arango's illegal procurement of the permanent resident status. So here they are trying to backtrack saying, well, wait a minute, because I can't get you out of the country. If you had a valid United States citizenship, I can't do that based on one criminal offense. He served his prison time for that offense. But now they're trying to make him run around those statutes by saying you shouldn't have been here in the first place. But they knew he was here illegally in the first place and failed to act. And in fact, we can now show that it doesn't boil down to the fact that because there was something in the New York file that the entire U.S. government immigration apparatus should have known of that. That's Mr. Arango's position, yes, that the government should have been aware of this. Let me just say that for just a minute. We have to be a little realistic here. The immigration problem is horrendous. There's 11 million people walking around and they're trying to deal with it. And it is something I've cornered as far as what we expect from the education records. And I suppose that you're making some pretty strong requirements here upon the government that they are actually going to know what all these 11 million people are doing. And they will periodically know it, part of it, not the other, because they aren't fully computerized or they have devised a way to get the government fully computerized and maybe never will. So the Sixth Circuit just says, well, why are we worried about this? As Truce Pivey says, the total information is clear. The man did not deserve to be here, nor does he deserve to be here now. And so you say no latches. The Sixth Circuit says latches just don't apply to the government for very practical reasons. Why shouldn't we follow the Sixth Circuit and be realistic about it? Just as well as I realize that it's unrealistic to assume that the government should know all of the FITs files and the immigration status of all the millions of people walking around this country. I understand that's impracticable and unrealistic. But in this case, the government knew Mr. Rangel's status. And, in fact, part of the government knew, and another part of the government didn't. You can't just say the government knew. I mean, the government is people. And you're saying the government, you're saying it's like everybody knows, but everybody doesn't know. That's why the Sixth Circuit gave that direction. Now, is there some compelling reason that we shouldn't follow the Sixth Circuit case? We should determine otherwise and create a split on the surface. How can we reconcile the government's knowledge of Mr. Rangel's sister, Ms. Opona, when they declare that the government is aware that Ms. Opona obtained her permanent residence status through the same sham marriage ring that Mr. Rangel obtained his permanent residence status from? The government is aware of that. And we do know, also, that the government has failed to proceed against Ms. Opona in bringing a denationalization action. So it's natural to have a method different. The thing is that you can't get the government for latches. And if it all comes out now and your defense is latches and they say, oh, you shouldn't do that, now we know what the real facts are and the person should not get away with it because the government has failed. Okay, why not? Why are we under arms? Why shouldn't we create a Sixth Circuit split on that issue? I think the very simple answer to that is the Costello case. It's a simple answer. The simple answer is Costello. So the United States Supreme Court in Costello did not foreclose upon the possibility that a denationalization defendant can rely on the doctrine of latches. And, in fact, in that case, it was a close call in that the government found that, well, there might have been lack of diligence on behalf of the government's part. The defendant there, Mr. Costello, failed to show prejudice in that case. The defendant was denationalized and said he was real sage and he was really a bootlegger. And at the time that he denationalized, the government wasn't aware of his status until 1938 when there were criminal proceedings. So in that case, those are different facts, and I believe in this case, our facts are a lot stronger. So you can tell that the latches can be recognized in this circuit. And in line with the Second Circuit, who also has not foreclosed upon the opportunity of acknowledging that latches is a valid defense against the government, there is a Sixth Circuit case, Sixth Circuit, and one of the things I believe that says, no, the government is immune. You cannot proceed. You cannot use latches as a defense. But this court is, in fact, in regard. Deng, in the Deng case, has actually left the possibility open to recognizing latches as a defense. In that case, the facts were a lot weaker than this case. And there should be no immunity by the government if the government knows and makes affirmative efforts and action to proceed along a certain course of conduct and then tries to backtrack. The government should be stopped from doing so. And, Your Honor, Justice, I would like to reserve the remaining two minutes for rebuttal. Thank you. Good morning. I'm Justice Bortenson with the Adoption Appeal of the United States. In this appeal, the appellate, Mr. Arango, is not contesting underlying merits of the order denationalizing him. He appears not to challenge the district court's conclusions that he entered into an illegal and a sham marriage, that he was, therefore, ineligible both for adjustment of status and for citizenship, and that, during the nationalization process, he deliberately concealed a sham marriage. All of these arguments today on appeal are those with actionable and procedural issues. I think an important starting point is the Supreme Court's statement in Fed Arango that courts lack equitable jurisdiction to refrain from entering the adjustment of denationalization against individuals whose citizenship was illegally procured or procured by willful misrepresentation of material facts. That doctrine, that lack of equitable jurisdiction to apply a defense against the government, was recognized by this court just last year, in March 2016, the Zao case, and in the Fareed case in 2011. So I'd like to start with that doctrine, and then turn it to Blatches, the opponent's first argument. It is the government's position that Blatches never applies in a single denationalization action. While this court recognized him today as an open question in this circuit, as judged by me, as acknowledged in the Sixth Circuit, the amendment to this case, the Sixth Circuit has come to the conclusion that Costello, the Supreme Court case on point, did not really leave this court open. And although Costello assumed, for purposes of that case, that it might apply, he did so because, under the facts of that case, the doctrine didn't apply. So the court did not need to reach the question of whether it could ever apply in a single denationalization case. While we would agree that that is the case here as well, that this court could find on these facts that the doctrine does not apply, nonetheless, we would take the position that in general, for several reasons, Blatches never applies against the government in a denationalization action, in a single denationalization action. First, that is because in Blatches, excuse me, in a denationalization action, the government is acting in its sovereign capacity. Blatches is not a defense when acting against, when the government is acting as a sovereign. Indeed, there's no more quintessential action than denationalization or denationalization. There's no individual rights. No individual person can bring an action either to naturalize or to denaturalize an individual. Therefore, in this case, when the government is acting in its sovereign capacity, Blatches should not apply. Similarly, because it's an equitable defense, as this court has recognized, we would fall within the Federenco guidance, as well as the guidance of this court in Zao and Farid, that no district court should apply a defense of inequity in a denationalization case. And third, the time risk in enacting a statute made no indication of a time limit that it intended to apply. It knows how to do so. So in the criminal context, the related action, if there was an action to provoke naturalization because of fraud, in the criminal context, there's a 10-year statute. Here, there is no guidance or barriers. Should the court raise the question of whether Blatches actually applies in these facts, we would point to the deduction of unclean hands, which would also bar the appellant from bringing his Blatches argument. In general formulas, this court recognized that a party with unclean hands may not assert Blatches. And here, Mr. Arengo has unclean hands. This court found that he deliberately misled the interviewer during his nationalization interview on the nature of his marriage to a U.S. citizen. Moreover, he fails to satisfy both elements of the statutory arm of the test, the lack of diligence by the government, and the prejudice in Castello. The court did not reach the question of diligence because it found there was no prejudice to the defendant. I think the court can do that here as well. The evidentiary precedence, he points to, is referred to witnesses. He cites, for example, the lack of being able to find Ms. Toronto. Here, it would point out that the defendant, appellant here, has not known where Ms. Toronto was since at least 1984, five years before he nationalized. He forced her by publication and default judgment because he could not find her. And there's testimony in the records suggesting that he did not know where she was since he entered the United States. I'm going back further than that. That's correct. That's correct. So he never met her and neither one attended the wedding ceremony. Instead, his sister was beltwayed up, and Mr. Diaz, the leader of the marriage club, right stood in at the wedding ceremony. In addition, Ms. Beltwaya, who has probably the best information in this situation, argued these facts. She testified for the government at the trial in that he knew that this was a sham marriage, that he never met Ms. Toronto, and the district court found that her memory was excellent. And Mr. Arrego has not challenged that factually finding. So the government witnesses also had excellent memory, according to the district court, in its factual findings. And the court... The government suggests that to the extent they don't remember specific instances of Mr. Arrego, it's in large part because he was such a minor player in the Diaz investigation, an investigation that involved more than 370 fraudulent marriages, in which he came in after they had already concluded the criminal portion of the investigation. Mr. Diaz had already not only pled guilty, but he had actually been sentenced for several months before Mr. Arrego came in and did his sworn statement. On the documentary evidence, we would also suggest that Mr. Arrego, his argument that he somehow had to submit that the ancient document of an exemption applied would be reported to the fact that he could have attacked without there was any suspicion as to the authenticity of the documents under the federal rules of evidence, as well as the fact that Mr. Arrego and Ms. Beltwaya themselves corroborated most of the documentary evidence. And finally, to the extent he argues that he couldn't have put forward a defense, we point to the fact that he represented himself quite ably for about our, excuse me, pro se for the first two to three years of this litigation, including not all, so as he successfully getting an appeal overturning the summary judgment grant by the district court, and that he participated fully in the trial and was deposed, and that there's no indication of what he would have done differently. To the extent he argues expectation-based prejudice, we would point, the government would point to the fact that all of his arguments go to whether he's even in the United States now, whether or not he is a United States citizen. Moreover, they all stem from the fact that he committed fraud originally and gave a benefit that he should never have had, and it should be revoked. I'll support his questions on the highlights in terms of the Sixth Amendment right to a jury trial question. Mr. Arango argues that he's entitled to a jury trial specifically under the Sixth Amendment and not the Seventh Amendment. Two threshold questions I think the court should consider. First, Mr. Arango's argument has been, and it's on his work library, that the issue was whether or not materiality with regard to the second basis under 8 U.S.C. 1451, that someone could have procured their citizenship by willful misrepresentation or concealment of material facts, and that it was the nature of materiality that he was entitled to a Sixth Amendment jury trial. First, that was only one of the three grounds on which the district court denaturalized the defendant, and therefore doesn't address all of the grounds that the court here could affirm on. Second, his jury demand was entitled 18 more than three years after his original answer, well up to the 14-day time period, and that was one of the grounds on which the district court denied or struck his third jury demand, and he does not appear to be challenging the timeliness ruling on appeal to that. Even if the court reaches the question of the Sixth Amendment, it's clear that the Sixth Amendment does not apply in this case. Mr. Arango cites the Gowdy case from this circuit, but conveniently overlooks the fact that Gowdy eventually was appealed to the United States Supreme Court, which affirmed the high circuit's ruling. And in that decision, the United States Supreme Court specifically distinguished Cundis, a civil denaturalization case that the case of the court had previously decided. It said, Cundis assuredly did not involve an adjudication to which the Sixth Amendment right to a jury trial attaches. That was a unanimous decision by the Supreme Court in 1995, and we would submit that that binds on this ruling. Mark, sir, excuse me, on this issue. Indeed, the Sixth Amendment only applies to criminal prosecutions, and this is decidedly a civil matter that was brought up. In his reply brief, Mr. Arango argues that because this subsection is so punitive that therefore he's entitled to a Sixth Amendment jury trial, we would argue that this is waived if it was not raised to the district court nor in his opening brief. Even if the court reaches that question, it's clear from case law that this is a remedial remedy and this is not a punitive remedy. Indeed, the act is subject to provoke an ill-gotten benefit and undoing of that which should not have been done in the first place. The Supreme Court has made clear in Trump that denaturalization is not imposed to penalize the alien for having falsified his application for citizenship, and in Schneiderman, the denaturalization suit is not a criminal proceeding. Additionally, the 7th and 6th circuits have addressed this and have found the same way that the Sixth Amendment right to a jury trial does not attach. Moreover, the Gowdy case using the 9th Circuit's decision notes that it specifically distinguishes civil cases and other criminal cases and notes that it was unique in that context because of the nature of materialities and elements under Section 1001 of the Penalty Team. And the Supreme Court did the same in its holding. Finally, on the Sixth Amendment issue, Cummese, the Supreme Court case that I previously mentioned, which the Gowdy Supreme Court decision distinguishes, specifically held that materiality in a civil denaturalization case is an issue of law that the Court could decide for itself. It did decide that the case bear on that issue. It did not need to remand to the Court of Appeals or to the District Court for any further proceedings on that issue. Now, with regard to whether the District Court properly excluded testimony, the standard here is abuse of discretion, and the government submits that Mr. Araigo has failed to meet that standard. The evidence that was excluded had to do with the harm that Mr. Araigo would allegedly suffer if denaturalization was entered against him. But as I have previously pointed out, all the RFC signs are actually related to removal and not denaturalization. Indeed, the effect of denaturalization is not automatic removal of Mr. Araigo. That is a decision for a different agency. The Department of Homeland Security decides whether to bring removal proceedings against him, and that is a decision that the increased judge will be able to rule on based on the way that the issue is presented. Denaturalization, the effect is simply to reduce the denaturalized individual back to the position they were in before the hook-on benefit was granted. So Mr. Araigo was referred back to being an alternate permanent resident, and it would be up to the Department of Homeland Security whether to take additional steps to speed up the immediate impact of Mr. Araigo. It's not his removal to Columbia, but rather he simply loses the citizenship he should not have in the first place. Indeed, the effect of the defendant's argument is that he should be able to continue benefiting long after his fraud, and the mere fact that he benefited for some time means he should continue doing so. But this would encourage, rather than discourage, fraud in the denaturalization process that if someone can simply evade detection for long enough, they can therefore continue to maintain and benefit from the ill-gotten status, the ill-gotten citizenship. And it would encourage people who have already committed fraud to continue fighting that fraud and hope that they can continue evading detection for long enough to trigger whatever time period Mr. Araigo believes is sufficient. Finally, Your Honor, I'd just like to point out that in his brief, Mr. Araigo argues that there was a cooperation agreement but there is some evidence to suggest that that existed, that it's directly contradictable to District Court's faction of finding these mistakes, which he has not contested, and in any event, which are, it is not clearly erroneous, based on the witness's testimony, including Ms. Valbuena's testimony that she did not have such an agreement and she was very clearly a much more important witness for the government in the Diaz criminal case. Does the Court have any questions? Thank you. I wanted to address briefly the unclean hands argument provided by the government's attorney. The government argues that Mr. Araigo has unclean hands because he misled the interviewer during his nationalization process. Again, it's Mr. Araigo's position that there's no way he can mislead the interviewer in that the government had or the interviewer should have had that information. That's why we ask the questions. Sometimes we ask the questions more than once and just because you answered it one way, the first time doesn't mean that you get to answer it differently the second time that we ask you a question. I'm sorry, Justice, if I wake you up. But I just wanted to follow up on the unclean hands argument made by the government. But his hands are unclean here. He denied, and I don't think you can speak to that. Right, and I think the focus here has been on the sham marriage, and there's been Mr. Araigo concedes that he did obtain his permanent residence status through a sham marriage. He'd never met his purported wife, and that's been conceded. The real argument here rests with that nationalization interview and whether or not he validly believed that Ms. Fripp, the interviewer, had the information contained in his file that assigned affidavit, basically. And it's Mr. Araigo's position that the interviewer did have the affidavit or should have had the affidavit. And also, in addition to... Is there any evidence that he did have the affidavit? That Ms. Fripp did have the affidavit? The government? The government. I don't believe that there is any evidence that Ms. Fripp did have the affidavit. And, in fact, she did testify at trial that she doesn't recall the interview, but had she had that information, she would not have allowed him to be staturalized. So she did testify to that. But it's Mr. Araigo's position that there is some constructive knowledge of that affidavit. Thank you. Thank you. Thank you for the argument this morning. United States v. Araigo is submitted.
judges: Wallace, McKeown, Bybee